377 So.2d 640 (1979)
Enoch LEWIS, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 49668.
Supreme Court of Florida.
November 1, 1979.
Rehearing Denied January 8, 1980.
*641 Emmett A. Moran, Winter Park, for appellant.
Jim Smith, Atty. Gen., and George R. Georgieff and Raymond L. Marky, Asst. Attys. Gen., Tallahassee, for appellee.
PER CURIAM.
This cause is an appeal from a judgment of guilty of murder in the first degree and sentence of death entered by the Circuit Court for Orange County, Florida. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution.
Enoch Lewis, Jr., appellant, was indicted for the first degree murder of Essie Lee Martin on November 28, 1975. The case came to trial on May 3, 1976, in the Circuit Court for Orange County, Florida.
The following facts emerged: Appellant and Martin had been friends for twenty years, but according to appellant their friendship had diminished in the six months preceding the shooting because Martin wanted money appellant had received from an insurance claim. Appellant testified that Martin and another friend, David Swift, repeatedly threatened him. Thomas McCann of the Orange County Sheriff's Department testified that approximately two months before the shooting he investigated a complaint by appellant that Swift had threatened him. McCann also testified, however, that appellant had not implicated Martin in the threats.
Martin's daughter and son witnessed the shooting. The daughter and son testified that the appellant drove up in a car and began talking with Martin; that after talking *642 for several minutes, appellant pulled out a gun and shot Martin several times; and that appellant continued to shoot Martin as the latter attempted to flee.
In support of a claim of self defense, appellant testified that on the day of the shooting he was carrying a gun because he was going to his cousin's house to kill a hog. Appellant testified that as he was driving past Martin's house, Martin flagged him down and said, "I told you I was going to kill you," and that believing Martin was about to shoot him, he shot Martin first.
The jury rendered a verdict of guilty of murder in the first degree and, during the sentencing phase of the proceedings, returned an advisory sentence of death. Appellant was sentenced to death by the trial judge who, in his findings of fact in support thereof, noted the following aggravating circumstances pursuant to section 921.141, Florida Statutes (1975): (1) that appellant had been previously convicted of a felony involving the use or threat of violence to the person [subsection (5)(b)]; (2) that appellant had knowingly created a great risk of death to many persons [subsection (5)(c)]; and (3) that the crime was especially heinous [subsection (5)(h)]. As the sole mitigating factor, the trial judge found that appellant had no significant history of prior criminal activity [subsection (6)(a)].
Five issues are presented for our consideration with respect to the propriety of appellant's conviction for murder in the first degree: (1) whether the questioning of a prospective alternate juror by the state's attorney during voir dire resulted in an impermissible comment upon the credibility of law enforcement officers as witnesses; (2) whether it was error to permit the wife of the victim to testify as to the latter's identity and whether she, as well as the victim's two children, were properly permitted to reveal their relationship to the deceased in their testimony; (3) whether appellant's witness, David Swift, was improperly qualified as a character witness as to appellant and, if so, whether such precluded inquiry by the prosecutor into specific acts of the accused; (4) whether the state's attorney's closing argument to the jury constituted a prohibited "golden rule" argument; and (5) whether the trial court erred in declining to instruct the jury on the offense of aggravated battery.
For the reasons hereinafter expressed, we affirm the conviction of appellant for murder in the first degree.
In his first point on appeal, appellant contends that a question propounded by the state's attorney to a prospective alternate juror during voir dire proceedings and in the presence of the rest of the venire, constituted an impermissible suggestion that the jury should more readily believe the testimony of a police officer than that of a lay witness. A reading of the disputed inquiry, however refutes this contention of appellant. In questioning the prospective alternate juror, a former law enforcement officer, the state's attorney asked:
[B]efore you heard any of the testimony, could you look at each witness' testimony with an open mind or do you think that your experience with the Winter Park Police Department has just given you a predisposition so that you could know that the police officers are always correct and always accurate and you would believe a police officer against someone else no matter what the circumstances are?
The prospective juror responded in the negative. This question did not contain a suggestion that the testimony of a police officer should be given greater weight than that of a lay witness. Rather, it was a proper and, indeed, highly commendable inquiry by the prosecutor as to any favorable bias which this former law enforcement officer and prospective alternate juror might possess with regard to a witness who was of the same profession. The purpose of the voir dire proceeding is to secure an impartial jury for the accused. See Pope v. State, 84 Fla. 428, 94 So. 865 (1923); Hunt v. State, 330 So.2d 502 (Fla.3d DCA 1976); Barker v. Randolph, 239 So.2d 110 (Fla. 1st DCA 1970); Gibbs v. State, 193 So.2d 460 (Fla.2d DCA 1967). Consequently, the possible bias of a member of the jury venire *643 which, as here, might affect the fairness of the trial of the accused, is clearly a proper ground of inquiry during this proceeding.
Appellant next challenges the fact that the wife of Essie Lee Martin, the victim, was permitted to testify that she identified the deceased as her husband at the Orange County morgue. It is argued that McKinley Lewis, a friend of the deceased and witness to his shooting, should instead have been called to testify with respect to the identity of the deceased. We are cognizant of the well-settled principle of law that a member of a murder victim's family may not testify for the purpose of identification of the deceased where a nonrelated witness is available to provide such identification. See Rowe v. State, 120 Fla. 649, 163 So. 22 (1935); Melbourne v. State, 51 Fla. 69, 40 So. 189 (1906); Ashmore v. State, 214 So.2d 67 (Fla. 1st DCA 1968); Hathaway v. State, 100 So.2d 662 (Fla.3d DCA 1958). However, the record in the case before us does not establish that McKinley Lewis, although a witness to the shooting and available to testify at trial, actually saw Essie Lee Martin after his death. Martin was shot in the early morning hours of November 28, 1975. Although McKinley Lewis assisted in transporting Martin to the hospital that morning, he testified that he did not go inside after the victim was taken to the emergency room. The record reflects that Martin did not die until 1:15 that afternoon. Because an examination of the record fails to establish that an individual who was not related to the decedent identified him after his death, and was available to testify to this fact at trial, we conclude that the testimony of Ms. Martin was properly admitted.
Appellant also contends that James Martin and Brenda Kelly, the son and daughter of Essie Lee Martin, were improperly allowed to testify with regard to their family ties with Martin. Although such testimony would be impermissible if introduced solely for the purpose of accentuating the fact that the decedent left surviving children, Rowe v. State, supra; Wolfe v. State, 202 So.2d 133 (Fla. 4th DCA 1967), due to the context within which this revelation was made we find appellant's argument to be unpersuasive. Both James Martin and Brenda Kelly testified that they were in James' front yard on November 28, 1975, and that they witnessed appellant shoot their father. Their testimony revealed that on the morning of the shooting appellant drove up to James Martin's home and asked to speak to the decedent. A conversation ensued between the two individuals. Appellant then began firing at Essie Lee Martin, striking him in the chest, and continued firing into his victim's back as the latter turned and attempted to flee. Neither witness observed Martin brandish a weapon or otherwise threaten appellant. This eyewitness testimony was highly relevant in the face of appellant's contention that he shot Martin in self-defense.
Because the testimony of these witnesses was essential for a purpose other than the mere identification of decedent  to rebut appellant's theory of self-defense  their testimony was properly introduced at appellant's trial. Further, in order to explain the decedent's presence in the front yard of James Martin and their observation of and participation in the events of November 28, 1975, it was not inappropriate for these witnesses to establish their relationship to Essie Lee Martin. The circumstances of the instant case are not unlike those present in Scott v. State, 256 So.2d 19 (Fla. 4th DCA 1971). There, the District Court of Appeal, Fourth District, found the trial judge had correctly permitted the mother of a murder victim to reveal her familial ties to the victim in her testimony. This determination of the court was grounded upon the fact that the mother's testimony was necessary for reasons other than solely to reveal that the victim of the murder was her son:
As we see it, the testimony of the mother was essential for more reasons than mere identification. She was a necessary prosecution witness because she formed an essential link in the chain of custody of her deceased son's clothing and her testimony concerning same and the finding of the knife closed in the *644 pocket of his clothing tended to discount defendant's... assertion [that he shot the decedent in self-defense after the latter brandished a knife]. Further, in order to explain her presence and possession of the clothing it was necessary to establish her relationship to the decedent. See Wolfe v. State, Fla.App. 1967, 202 So.2d 133.
256 So.2d at 21.
In his third point on appeal, appellant's counsel posits that the testimony of defense witness, David Swift, did not in fact relate to the character of the accused and that, in any event, this witness was not qualified as competent to testify as to this issue. Therefore, inquiry by the state's attorney on cross-examination as to whether Swift had heard of appellant having shot someone prior to the murder of Essie Lee Martin is urged to be improper. This question was in reference to an alleged incident during which Enoch Lewis, Jr. purportedly shot his wife.
We acknowledge the well-established rule that the prosecutor may not inquire with regard to specific acts of the accused where the latter has not chosen to place his character in issue. See Young v. State, 141 Fla. 529, 195 So. 569 (1940); Layton v. State, 348 So.2d 1242 (Fla. 1st DCA 1977); Roti v. State, 334 So.2d 146 (Fla.2d DCA 1976); Post v. State, 315 So.2d 230 (Fla.2d DCA 1975). However, due to our determination that appellant did place his character in issue through the testimony of David Swift, he is now precluded from arguing that the witness was unqualified to give such testimony. Therefore, the inquiry of the State on cross-examination was proper.
On direct examination, the following colloquy took place between the witness, David Swift, and appellant's counsel:
Q And did you ever know Enoch Lewis, Jr., to own or carry a gun?
A No, sir, never have.
Q And you never knew of any threats of Enoch Lewis on the life of Essie Martin?
A No, sir, never have.
* * * * * *
Q You lived in the community where the incident took place and you never heard anything bad about either man? (Emphasis supplied)
A No sir. I get off work at 6:00 o'clock and goes to work at 6:00 o'clock and would be home and I don't know what happened. I turn my TV set on and look at TV.
Appellant's counsel suggests that because neither he nor the witness used the magic word "character," this testimony did not constitute a comment with respect to the character of the accused for violent activities. The trial court rejected this contention and we concur with its conclusion in this regard. It is evident from a reading of the colloquy above that defense counsel was indeed seeking to elicit character testimony with respect to the trait of violence. Counsel further suggests that because he did not ask the witness whether he was familiar with the general reputation of appellant in the community and his reputation for violent activities but, rather, merely inquired whether Swift had heard anything bad about his client, the witness was not properly qualified to give this testimony. In support of this contention, appellant cites Hinson v. State, 59 Fla. 20, 52 So. 194 (1910), which enunciates the principle that, as a predicate for the testimony of a character witness, it must be established that the witness is familiar with the general reputation in the community of the individual at issue and the trait in question. However, we conclude that because David Swift did testify with respect to the character of appellant, the accused may not reap the benefits of this testimony at trial, which was introduced without objection by the State, and later on appeal contend that the state's cross-examination was impermissible because Swift was not properly qualified as a character witness. Furthermore, even if we were to conclude that the trial court erred in overruling the objection, appellant's argument is unavailing because surely the witness' response to the prosecutor's *645 question made harmless any such error. That response was that the witness had not heard of any earlier incident involving appellant's shooting another person. See section 924.33, Florida Statutes (1975).
The fourth issue before us involves a challenge to the following statement made by the state's attorney during closing argument to the jury:
Now, if you just shot a man in an alleged self defense, wouldn't you tell that to the deputy? Instead of, "He's been bugging me a long time and I'm tired of it and I shot him."
Appellant contends that this remark constitutes a prohibited "golden rule" argument in that the jury was asked to place themselves in the shoes of the accused and consider what they would have said under similar circumstances. We find appellant's argument to be without merit. The prosecutor's remark was in clear reference to the inconsistency between appellant's defense at trial of self-defense, and the statement made by appellant to the arresting officer following the killing. As such, the disputed statement constituted a proper comment upon the credibility of appellant's defense, which was within the bounds of the evidence presented in the case. See Spencer v. State, 133 So.2d 729 (Fla. 1961); Reaves v. State, 324 So.2d 687 (Fla.3d DCA 1976); Mabery v. State, 303 So.2d 369 (Fla.3d DCA 1974). We fail to find any prejudice to appellant from the prosecutor's remarks. This is unlike the cases where prejudicial error was found in the prosecutor's request that the jury consider whether they, or others, would be the defendant's next victims if they failed to convict him. Grant v. State, 194 So.2d 612 (Fla. 1967); Stewart v. State, 51 So.2d 494 (Fla. 1951). Clearly, such a statement would be irrelevant to the innocence or guilt of the accused for the crime charged and, as such, would constitute an improper and highly inflammatory matter to present to the jury. Such is not the case here.
The fifth issue involves the refusal of the trial judge, over the objection of defense counsel, to instruct the jury on the offense of aggravated battery. Appellant argues that an instruction on this purported lesser included offense of the crime of homicide was mandated because the facts indicate that he may have intended to commit aggravated battery upon, rather than to kill, Essie Lee Martin. This argument is refuted by the decision of this Court in Brown v. State, 245 So.2d 68 (Fla. 1971).
In Brown, the defendant was charged with a first degree murder which was committed during the course of a robbery. In concluding that the trial judge had properly refused the defendant's request for an instruction on aggravated assault, assault and battery and simple battery, we held that in homicide cases the proper jury instructions are limited to those charges involving lawful and unlawful homicide. In reaching this conclusion we adopted the rationale of the District Court of Appeal, Second District, in Sadler v. State, 222 So.2d 797, 799-800 (Fla.2d DCA 1969), wherein the court rejected a similar challenge:
The trial Judge did appropriately instruct the jury as to all degrees of murder, manslaughter, justifiable homicide, and excusable homicide, all having to do with the death of the victim.

* * * * * *
What we have here was either unlawful homicide or lawful homicide. The death of a human being at the hands of defendant Sadler was concededly involved. If defendant's contention as to `lesser included offenses' is sound, then the trial Judge would have been required, upon request, to run down the gamut of the criminal lexicon to minor petty offenses such as disorderly conduct or disturbing the peace. This was a death case, not an assault case. We hold there is no merit to this point.
245 So.2d at 75 (emphasis in original).
In our recent decision in Martin v. State, 342 So.2d 501 (Fla. 1977), in which we reaffirmed Brown, we further elucidated the rationale for our holding that, in a homicide prosecution, aggravated assault does not constitute a lesser included offense upon which the jury must be instructed:

*646 The jury's duty is to ascertain whether the defendant caused the victim's death, and, if so, whether the homicide was justifiable or unjustifiable. If the jury finds that an unlawful homicide has occurred, they must then determine what degree of murder or manslaughter is involved. Whether an aggravated assault occurred as part of a crime that culminated in the death of the victim is patently immaterial.

342 So.2d at 502-03 (emphasis supplied).
This rationale equally applies to a homicide prosecution where, as here, the defendant requests an instruction on the offense of aggravated battery; whether an aggravated battery occurred during the course of the killing is patently immaterial.
Finally, we must consider the propriety of the sentence of death imposed by the trial judge, after the advisory sentence of the jury that this ultimate penalty be imposed. See McCaskill v. State, 344 So.2d 1276 (Fla. 1977); Douglas v. State, 328 So.2d 18 (Fla. 1976); State v. Dixon, 283 So.2d 1 (Fla. 1973). The trial court found that three aggravating circumstances enumerated in section 921.141(5), Florida Statutes (1975), were present. We concur in the sentencing judge's determination that appellant satisfied the criteria of section 921.141(5)(b) in that he previously had been convicted of assault with intent to commit manslaughter. However, we do not agree with the findings that appellant knowingly created a great risk of death to many persons [subsection (5)(c)] and that the murder was "especially heinous" [subsection (5)(h)]. The finding under subsection (5)(c) was based upon the fact that the decedent's daughter and son were standing in the yard in the possible path of bullets when their father was shot. In Kampff v. State, 371 So.2d 1007 (Fla. 1979), we rejected a finding of this aggravating factor under circumstances similar to those before us. There, the appellant fatally shot his victim in a bakery while two other persons were present. The following reasoning and conclusion of the Kampff Court is applicable to the case at bar:
The great risk of death created by the capital felon's actions must be to "many" persons. By using the word "many," the legislature indicated that a great risk of death to a small number of people would not establish this aggravating circumstance. We hold that the trial court erred in finding that the appellant created a great risk of death to many persons.
371 So.2d at 1009. The finding under section 921.141(5)(h) was predicated upon the fact that appellant shot the victim in the chest and, as the latter attempted to flee, shot him several more times in the back. In State v. Dixon, we held that "heinous" means "extremely wicked or shockingly evil." We then elucidated the acts which the legislature intended to come within the scope of that term:
What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
283 So.2d at 9. Accord, Cooper v. State, 336 So.2d 1133 (Fla. 1976); Tedder v. State, 322 So.2d 908 (Fla. 1975).
It is apparent that all killings are heinous  the members of our society have deemed the intentional and unjustifiable taking of a human life to be nothing less. However, the legislature intended to authorize the death penalty for the crime which is "especially heinous"  "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." (Emphasis supplied.) The killing in the case at bar simply does not fall within that category when viewed in the context of the published decisions of this Court. Cf. Barclay v. State, 343 So.2d 1266 (Fla. 1977) (murder heinous in that victim was stabbed while begging for mercy and then killed by shots to the head); Adams v. State, 341 So.2d 765 (Fla. 1977) (murder heinous in that victim was beaten with fire poker past point of submission and until grossly mangled).
The trial judge found one mitigating circumstance  that appellant has no significant *647 history of prior criminal activity [subsection (6)(a)].
Because we have found no reversible error with respect to the conviction of appellant, we hereby affirm the judgment of guilty of murder in the first degree. However, because the trial judge imposed the sentence of death after having improperly found the aggravating circumstances enunciated in sections 921.141(5)(c) and (h), Florida Statutes (1975), to exist, that sentence must be vacated. See Elledge v. State, 346 So.2d 998 (Fla. 1977). Accordingly, this cause is remanded to the trial judge solely for the purpose of resentencing the appellant without taking into consideration the aggravating circumstances delineated in sections 921.141(5)(c) and 921.141(5)(h), Florida Statutes (1975).
It is so ordered.
ENGLAND, C.J., and BOYD, OVERTON and SUNDBERG, JJ., concur.
ADKINS, J., concurs in part and dissents in part with an opinion.
ADKINS, Judge, concurring in part and dissenting in part.
I concur in that portion of the opinion affirming the judgment of guilty of murder in the first degree, but dissent from that portion of the opinion which sets aside the sentence and remands the cause to the trial judge solely for the purpose of resentencing.
The majority opinion says that shooting a person in the chest and shooting him several more times as he attempts to flee is not "heinous" within the meaning of the statute defining aggravating circumstances. The son of the victim was an eye witness to the homicide. He described it as follows:
Well, when he first shot, blood jumped out of his chest and he shot him again and it did again. So by that time my father had turned and he turned and he continued shooting him. And so when my father took off I took off and ran
...
Q. And what was Enoch Lewis doing at the time your father was running toward the house?
A. Still shooting at him.
The attempt by the victim to run away was equivalent to begging for mercy. When the defendant continued to shoot the homicide certainly became "conscienceless or pitiless" as well as "unnecessarily torturous to the victim." State v. Dixon, 283 So.2d 1, 9 (Fla. 1973).
Blood spurted from the victim's chest when the first shot was fired. The additional acts of shooting several times while the victim was trying to run away certainly set this crime apart from the norm of capital felonies.
Conceding that the defendant did not knowingly create a great risk of death to many persons and that this was improperly considered as an aggravating circumstance, nevertheless, the death sentence was properly imposed. The only mitigating circumstance found by the trial judge was that the defendant had no significant history of prior criminal activity. On the other hand, the court properly found that defendant had been convicted of an assault with intent to commit manslaughter, which was an aggravating factor.
At least one aggravating circumstance was properly found by the court. Therefore, death should be presumed to be the proper sentence unless the aggravating circumstance is overridden by one or more of the mitigating circumstances. State v. Dixon, 283 So.2d 1 (Fla. 1973).
The fact that defendant was previously convicted of a felony involving the use or threat of violence to the person certainly offsets the sole mitigating factor, i.e., no significant history of prior criminal activity. The sentence of the trial court, bolstered by the recommendation of the sentencing jury, was the result of a reasoned judgment. We should not magnify a deficiency to such an extent as to cloud our review of this sentencing decision.
In Gibson v. State, 351 So.2d 948 (Fla. 1977), the death penalty was upheld where defendant and a companion planned to "roll" two seamen and persuaded two women to assist by getting the victims into an automobile. While the victims were offering money and begging for their lives, the *648 defendant fatally shot one twice in the head and wounded the other. The murder was especially heinous, atrocious, and cruel.
The death penalty in Raulerson v. State, 358 So.2d 826 (Fla. 1978) was upheld where defendant had committed robbery and rape just prior to killing a police officer. There were many shots fired and the deceased was well aware that his life was in danger. The murder was held to be especially heinous, atrocious, and cruel.
As stated in Elledge v. State, 346 So.2d 998, 1003 (Fla. 1977), "we must guard against any unauthorized aggravating factor going into the equation which might tip the scales of the weighing process in favor of death."
However, there is no danger that the unauthorized aggravating factor served to overcome the mitigating circumstance when the trial judge in the instant case engaged in the weighing process dictated by our statute.
Although the trial judge improperly considered the factor that the murder created a great risk of death to many persons, the aggravating factors which remain are sufficient to justify the sentence of death imposed by the trial court.